SWAN CONSULTANTS, INC. and William S. Swan, Plaintiffs,

v.

TRAVELERS PROPERTY CASUALTY COMPANY, Defendant.

No. 03 Civ. 7905 (JES).

United States District Court, S.D. New York.

March 17, 2005.

The Dweck Law Firm, LLP, New York, New York, Jack S. Dweck, for Plaintiffs, of Counsel.

Drinker Biddle & Reath LLP, Florham Park, New Jersey, William T. Corbett, Jr., for Defendants, of Counsel.

## MEMORANDUM OPINION AND ORDER

SPRIZZO, District Judge.

Plaintiffs William S. Swan ("Dr. Swan") and Swan Consultants, Inc. (together

"plaintiffs") bring the above-captioned declaratory judgment action against defendants, The Travelers Indemnity Company of Connecticut and The Automobile Insurance Company of Hartford Connecticut, incorrectly pled as Travelers Property Casualty Company (collectively "Travelers" or "defendants"), seeking a declaration that Travelers is required to defend and indemnify plaintiffs in the action styled *Ana Sola v. Dr. William S. Swan and Swan Consultants, Inc.*, Index No. 100004/03 ("the underlying action"). Plaintiffs move and defendants cross-move for summary judgment. For the reasons that follow, plaintiffs' motion for summary judgment is denied and defendants' cross-motion is granted.

## BACKGROUND

### The Underlying Action

Ana Sola ("Sola") filed the underlying action, currently pending in the New York Supreme Court, against plaintiffs in December 2002. *See* Affidavit of William T. Corbett, Jr. ("Corbett Aff."), Exhibit ("Ex.") A (hereinafter "Sola Complaint"). In her Complaint, Sola asserts five claims against plaintiffs allegedly stemming from an interview and training session with Dr. Swan, a licensed psychologist and the principal of Swan Consultants, Inc. *See* Sola Complaint. Sola specifically charged plaintiffs with professional malpractice,[1] assault, battery, intentional infliction of emotional distress, and sexual harassment. *Id.* ¶¶ 52–92.

Prior to Sola's interview and training session, plaintiffs had placed an advertisement in the Sunday *New York Times* on June 30, 2002 that read, "PART–TIME. Work with psychologist. Deliver individualized assertiveness training program.

Psychology bkgrnd helpful; bilingual a +. $100/session. Must be avail daytime hrs." *Id.* ¶ 6. Sola responded to the advertisement and later received a call from Dr. Swan, indicating his desire to work with her. *Id.* ¶¶ 7, 9–10.

Sola first met with Dr. Swan at his New York City office on July 24, 2002. *Id.* ¶ 11. Although Dr. Swan informed Sola that he specialized in training companies and their managers to be more successful, he told her that he was looking for someone to assist him with a project that involved helping women with issues related to past sexual trauma. *Id.* ¶¶ 12–13. The project had been developed by the California Institute and entailed giving the women "therapeutic massages." *Id.* ¶ 15. Dr. Swan then showed Sola a portfolio of erotic photographs that were to be shown to clients during the sessions. *Id.* ¶ 16.

Sola met with Dr. Swan a second time on July 30, 2002. *Id.* ¶ 18. Upon arriving, Dr. Swan asked her to change into a bathrobe because he was going to give her a "therapeutic massage." *Id.* ¶¶ 19, 21. Dr. Swan indicated that this was necessary so she could not only learn the proper technique, but also understand how the clients would feel during the sessions. *Id.* ¶¶ 21–22. Sola changed into the bathrobe, leaving on her undergarments. *Id.* ¶ 23.

Dr. Swan next instructed Sola to lie down on her stomach on towels he had placed on the floor, and proceeded to massage her. *Id.* ¶¶ 24–25. Dr. Swan unhooked her bra so he would "have access to her back" and proceeded to rub her shoulders in a rough manner, prompting Sola to tell him that he was hurting her and to ask who had trained him. *Id.* ¶¶ 25–26. Dr. Swan responded that he was trained by the California Institute,

---

**1.** Plaintiffs indicate that the first cause of action for professional malpractice was dismissed by order of the Hon. Marilyn Shafer. *See* Pls.' Mot. for Summ. J., Ex. 1.

and then switched to a very soft form of massage, lightly touching Sola's arms, neck, shoulders, and back. *Id.* ¶¶ 27, 30.

It was at this time that Dr. Swan allegedly attempted to remove Sola's panties, an act to which Sola vigorously objected. *Id.* ¶¶ 31–32. Although Sola allegedly expressed discomfort throughout the massage, Dr. Swan attempted to allay her fears by explaining that this type of conduct would enable clients to open up by removing "blocks" caused by past sexual abuse. *Id.* ¶¶ 33–34. Shortly thereafter, Dr. Swan moved Sola's bathrobe up and proceeded to touch her buttocks. *Id.* ¶ 38. Sola directed him to stop, after which he again emphasized that he was not trying to be offensive, but was merely performing the technique and "treating" her for her own "blocks." *Id.* ¶¶ 38–39.

Dr. Swan then asked Sola to turn over onto her back. *Id.* ¶ 40. Dr. Swan attempted to move his hands about Sola's upper body, but she closed her arms around her chest. *Id.* ¶ 41. After being asked if she felt uncomfortable about having her breasts touched, Sola indicated that she felt uncomfortable having him touch her there and, at the moment, was feeling very uncomfortable. *Id.* ¶ 42. Dr. Swan indicated that these massages, in addition to removing "blocks," could also encourage women in the program to further explore their sexuality. *Id.* ¶ 44. Dr. Swan told Sola that this may result in touching and oral sex between Dr. Swan and Sola, as well as between Dr. Swan and Sola and the clients. *Id.* ¶ 45.

Sola responded that she would not consent to sexual contact with Dr. Swan or the clients. *Id.* ¶ 47. It was at this time that Dr. Swan allegedly forced Sola's legs open and positioned himself in the middle, moving his hands up her legs toward her vaginal area. *Id.* ¶ 48. Sola screamed at him to stop, got up from the floor, and

changed back into her clothes. *Id.* ¶ 49. After Sola returned, she told Dr. Swan that he should have explained the highly sexualized nature of the "therapeutic massage" before he performed it on her. *Id.* ¶ 50.

### The Insurance Policies

It is undisputed that at the time of the aforedescribed incident, plaintiffs had two insurance policies in effect issued by defendants: a commercial general liability policy, Policy No. I–680–907G1856–TCT–01 (the "CGL Policy"), and a homeowner's policy, Policy No. OVG797–969993278–699–01 (the "Homeowner's Policy"). *See* Affidavit of Ann Marie Thiergartner ("Thiergartner Aff."), ¶¶ 3–4 and Exs. A, B; Plaintiffs' Statement of Undisputed Facts ("Pls.' St.") ¶ 10.

The CGL Policy agrees to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury'...." CGL Policy, Form CG F1 47 03 98, at 1. The insurance covers "bodily injury" only if such injury is caused by an "occurrence," which is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." CGL Policy, Form CG 00 01 10 93, at 1, 10. The CGL Policy, however, explicitly excludes coverage for bodily injury "expected or intended from the standpoint of the insured." CGL Policy, Form CG 00 01 10 93, § I.A.2.a., at 1.

The CGL Policy also provides that Travelers "will pay those sums that the insured becomes legally obligated to pay as damages because of 'personal injury' ... to which this insurance applies." CGL Policy, Form CG F1 47 03 98, § C.1.a., at 1–2. "Personal injury" is defined as an

injury, other than 'bodily injury', arising out of one or more of the following offenses: a. False arrest, detention or imprisonment; b. Malicious prosecution;

c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor; d. Oral, written or electronic publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or e. Oral, written or electronic publication of material that violates a person's right of privacy.

CGL Policy, Form CG F2 10 11 00, "Personal Injury", at 3. The CGL Policy makes clear that Travelers does not have a duty to defend "against any 'suit' seeking damages for 'personal injury' . . . to which this insurance does not apply." CGL Policy, Form CG F1 47 03 98, § C.1.a., at 2.

The plaintiffs' Homeowner's Policy provides, "[i]f a claim is made or a suit is brought against any **insured** for damages because of **bodily injury** . . . caused by an **occurrence** to which this coverage applies, even if the claim or suit is false, we will . . . pay up to our limit of liability for the damages for which the **insured** is legally liable; and . . . provide a defense at our expense by counsel of our choice." Homeowner's Policy, Form HA–9 (12–86), § II, at 10. The Homeowner's Policy defines "occurrence" as "an accident, including exposure to conditions which results, during the policy period, in: a. bodily injury; or b. property damage," Homeowner's Policy, Form HA–9 (12–86), at 1, or "offenses which result, during the policy period, in personal injury." Homeowner's Policy, Form 55621 N.Y. (08–99), at 1. The Homeowner's Policy then enumerates a number of exclusions from coverage, including one for bodily injury "which is expected or intended by any **insured**." Homeowner's Policy, Form HA–9 (12–86), § II.1.a., at 10.

The Homeowner's Policy likewise provides coverage for "personal injury," which is defined as an "injury arising out of one or more of the following offenses: a. False arrest, detention, or imprisonment, b. Malicious prosecution; c. Libel, slander or defamation of character; or d. Invasion of privacy, wrongful eviction or wrongful entry." Homeowner's Policy, Form 55621 N.Y. (08–99), at 1. The policy contains an exclusion, however, for personal injury "arising out of the business of any **insured**." *See* Homeowner's Policy, Form 55621 N.Y. (08–99), § II.2.j.(4), at 3.

*Commencement of this Action*

Plaintiffs notified defendants of the underlying action by sending them a copy of the Summons and Verified Complaint in a letter dated February 5, 2003. *See* Thiergartner Aff., Ex. C. In letters dated March 6, 2003, defendants denied coverage for the underlying action, indicating that it was not appropriate under the terms of either the CGL or the Homeowner's Policies. *See* Thiergartner Aff., Exs. D, E.

Plaintiffs filed this declaratory judgment action in the Supreme Court of New York seeking a declaration that Travelers is required under the aforedescribed policies to defend and indemnify them. The case was removed to this Court, where the parties subsequently made their current respective motions for summary judgment.

## DISCUSSION

A court may grant summary judgment only if it determines that there are no genuine issues of material fact based on a review of the pleadings, depositions, answers to interrogatories, admissions on file and affidavits. *See* Fed.R.Civ.P. 56(c). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When ruling on a

summary judgment motion, a court must construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If no genuine issue as to any material fact exists, the nonmoving party is entitled to summary judgment as a matter of law. *See Celotex*, 477 U.S. at 323, 106 S.Ct. 2548.

The issue for this Court to resolve is whether defendants must defend and indemnify plaintiffs in the underlying action. Except for the employment status of Sola in relation to plaintiffs, the relevant facts are not disputed.[2] *See* Pls.' St. ¶ 7; Defs.' St. ¶ 2, 5.

■ "It is settled law that an insurer must afford its insured a defense unless it can show that the allegations of the complaint put it solely within the policy exclusion." *Allstate Ins. Co. v. Mugavero*, 79 N.Y.2d 153, 162, 589 N.E.2d 365, 370, 581 N.Y.S.2d 142, 147 (1992) (citation omitted). If, however, the factual allegations of the underlying complaint indicate that there is "no basis for recovery within the coverage

of the policy . . ., [a court] may sustain [the insurance company's] refusal to defend." *Id.* at 163, 589 N.E.2d at 370, 581 N.Y.S.2d at 147 (quoting *Lionel Freedman, Inc. v. Glens Falls Ins. Co.*, 27 N.Y.2d 364, 368, 267 N.E.2d 93, 94, 318 N.Y.S.2d 303, 305 (1971) (first alteration in original)). When evaluating whether a liability insurance policy covers a particular claim, courts look to "the factual allegations of the complaint, and not its legal characterizations of the underlying events [in order to] determine the availability of coverage." *Dodge v. Legion Ins. Co.*, 102 F.Supp.2d 144, 150 (S.D.N.Y.2000); *see Mugavero*, 79 N.Y.2d at 162–63, 589 N.E.2d at 370, 581 N.Y.S.2d at 147.[3]

Although insurance policies normally cover the accidental consequences of intentional acts, a point which plaintiffs stress in their briefs, *see* Pls.' Mem. for Summ. J. at 11, Pls.' Mem. in Opp'n to Defs.' Mot. at 10–12, the New York Court of Appeals has recognized in a controlling case that there are some acts in which the alleged harm is an inherent result of the intentional acts. *See Mugavero*, 79 N.Y.2d at 160, 589 N.E.2d at 369, 581 N.Y.S.2d at 146. For some conduct, "cause and effect cannot be

---

**2.** Sola's disputed employment status, specifically whether she was an actual employee of Dr. Swan's during the interview and training session, does not take this case out of the realm of summary judgment because it has no effect on the Court's determination of this motion; "[w]hile genuineness runs to whether disputed factual issues can 'reasonably be resolved in favor of either party,' materiality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 5 (2d Cir.1999) (quoting *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir.1996) (quoting and citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986))). Plaintiffs do not dispute that Sola interviewed and went through a training session with Dr.

Swan, for which she was paid. *See* Pls.' St. ¶ 4.

**3.** Plaintiffs' argument that because Dr. Swan "denied any untoward or unprofessional conduct in the two interview sessions with Ms. Sola" and "brought [this] to the attention of [defendants]", that defendants then had the obligation and duty to defend plaintiffs, *see* Pls.' Mem. for Summ. J. at 9, is without merit; the Court looks to the factual allegations of the underlying complaint, and not Dr. Swan's response to it in determining the availability of coverage. *See Doe v. Allstate Ins. Co.*, 187 A.D.2d 181, 182, 596 N.Y.S.2d 603, 604 (4th Dep't 1993) ("[W]e need not be concerned with the truth or falsity of the facts alleged in the underlying action, as we must deem them to be true.")

separated; that to do the act is necessarily to do the harm which is its consequence; and that since unquestionably the act is intended, so also is the harm." *Id.,* 589 N.E.2d at 369, 581 N.Y.S.2d at 146.

In *Mugavero,* a mother sued a couple claiming that the husband had sexually abused her two children while they were in the care of his wife, a baby-sitter. *Id.* at 156–57, 589 N.E.2d at 366–67, 581 N.Y.S.2d at 143–44. The couple in turn demanded that their homeowner's insurance carrier grant them a defense and indemnification. *Id.,* 589 N.E.2d at 366–67, 581 N.Y.S.2d at 143–44. The underlying complaint contained explicit allegations of both negligence and intentional conduct on the part of the husband as against the children, *id.* at 157, 589 N.E.2d at 367, 581 N.Y.S.2d at 144, and yet the court rejected the argument that, because of the negligence allegations, the insurance company's intentional conduct exclusion[4] did not apply. *Id.* at 160, 589 N.E.2d at 369, 581 N.Y.S.2d at 146. The court held that the harm to the children involved "was inherent in the nature of the acts alleged and that whatever injuries resulted were, as a matter of law, 'intentionally caused' within the meaning of the policy exclusion," *id.* at 161, 589 N.E.2d at 370, 581 N.Y.S.2d at 147, and accordingly declared that the insurance company had no duty to defend the couple in the underlying action. *Id.* at 164, 581 N.Y.S.2d at 149, 589 N.E.2d at 372.

Courts have subsequently applied this *Mugavero* inferred intent rule to claims of non-consensual sexual intercourse, *see, e.g., Travelers Ins. Cos. v. Stanton,* 223 A.D.2d 104, 105–06, 645 N.Y.S.2d 948, 949 (3d Dep't 1996), as well as to claims of sexual contact, albeit not non-consensual, between

a therapist and his patient. *See Dodge,* 102 F.Supp.2d at 152.

■ The conduct alleged in the Sola Complaint consists of Dr. Swan abusing his position as a potential employer by convincing Sola, his interviewee, to place herself in a vulnerable state for the sake of "training" and then subjecting her to unwelcomed sexual advances and touching; such allegations are more egregious than the presumably consensual sexual contact between therapist and patient found in *Dodge,* 102 F.Supp.2d at 152, and likewise merits application of the *Mugavero* inferred intent rule. Notwithstanding the fact that three of the allegations in the Sola Complaint alternatively pleaded that Dr. Swan's conduct was "reckless," *see* Sola Complaint ¶¶ 64, 78, 83, the factual allegations contained therein allege conduct on Dr. Swan's part that is intrinsically intentional and inherently harmful. *See Mugavero,* 79 N.Y.2d at 160, 589 N.E.2d at 369, 581 N.Y.S.2d at 146; *Dodge,* 102 F.Supp.2d at 151.

■ Turning to the two policies involved in this action, the Court first finds that plaintiffs are not entitled to coverage under the CGL Policy. The underlying action simply fails to allege a covered "bodily injury." The CGL Policy only covers "bodily injury" that is caused by an "occurrence," which is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *See* CGL Policy, Form CG 00 01 10 93, at 10. "Injuries 'which flow directly and immediately from an intended act' are not considered accidental." *Moncada v. Rubin–Spangle Gallery, Inc.,* 835 F.Supp. 747, 749 (S.D.N.Y.1993) (quoting *Continental Ins. Co. v. Colangione,* 107

---

4. As in the policies involved in this action, the couple's insurance policy contained an "exclusion for bodily injury 'intentionally caused by an insured person.' " *Mugavero,* 79 N.Y.2d at 156–57, 589 N.E.2d at 367, 581 N.Y.S.2d at 144.

A.D.2d 978, 979, 484 N.Y.S.2d 929, 930 (3d Dep't 1985)). Having already determined that the underlying action alleges intentional conduct on the part of Dr. Swan, it cannot be said such conduct was accidental and therefore the underlying action does not allege an "occurrence."

■ Even assuming, however, that a covered "bodily injury" was alleged, the "expected or intended" exclusion in the CGL Policy bars coverage. The exclusion states that "[t]his insurance does not apply to ... 'Bodily injury'... expected or intended from the standpoint of the insured." CGL Policy, Form CG 00 01 10 93, § I.A.2.a., at 1. As the underlying action in this case alleges only intentional acts on the part of plaintiffs, such exclusion applies.

■ Nor does the underlying action allege a covered "personal injury" offense as defined by the CGL Policy. The Sola Complaint, which consisted only of professional malpractice, assault, battery, intentional infliction of emotional distress, and sexual harassment allegations, does not contain anything that fits under the "personal injury" definition, which is limited to the offenses of false arrest, detention, or imprisonment; malicious prosecution; wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor; oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products, or services; or oral or written publication that violates a person's right to privacy. See CGL Policy, Form CG F2 10 11 00, "Personal Injury", at 3.

■ Similarly, plaintiffs are not entitled to coverage under the Homeowner's Policy because the underlying action does not allege a covered "bodily injury" offense. Only bodily injuries that result from an "occurrence" are covered pursuant to this policy. See Homeowner's Policy, Form HA–9 (12–86), § II, at 10. "Occurrence" is defined as "an accident, including exposure to conditions which results, during the policy period, in a. bodily injury; or b. property damage". Homeowner's Policy, Form HA–9 (12–86), at 1. For the aforementioned reasons, the Court has already determined plaintiffs' alleged conduct was intentional, not accidental, and it therefore does not qualify as an "occurrence."

■ In any event, as was the case under the CGL Policy, the "expected or intended" exclusion found in the Homeowner's Policy would apply to the conduct alleged in the underlying action. See Homeowner's Policy, Form HA–9 (12–86), § II.1.a., at 10.

■ Nor does the underlying action allege a covered "personal injury" offense under the Homeowner's Policy. Such policy states that a "personal injury" must result from at least one of the following: (1) false arrest, detention, or imprisonment; (2) malicious prosecution; (3) libel, slander or defamation of character; or (4) invasion of privacy, wrongful eviction, or wrongful entry. Homeowner's Policy, Form 55621 N.Y. (08–99) ("NY Form"), at 1. None of these offenses were suggested, let alone alleged, in the Sola Complaint, which contains professional malpractice, assault, battery, intentional infliction of emotional distress, and sexual harassment claims.

■ Additionally, the Homeowner's Policy excludes coverage for personal injury "arising out of the business of any **insured.**" Homeowner's Policy, Form 55621 N.Y. (08–99), § II.2.j.(4), at 3. The "arising out of" language, when used in an insurance policy exclusion, is construed as

a but-for test. *See Mount Vernon Fire Ins. Co. v. Creative Hous. Ltd.,* 88 N.Y.2d 347, 351–53, 668 N.E.2d 404, 405–07, 645 N.Y.S.2d 433, 434–36 (1996). To qualify as a business within such exclusion, Dr. Swan must have " 'regularly engaged in a particular activity with a view toward earning a livelihood or making a profit.' " *Cardinal v. Long Island Power Auth.,* 309 F.Supp.2d 376, 391 (E.D.N.Y.2004) (quoting *Showler v. Am. Mfrs. Mut. Ins. Co.,* 261 A.D.2d 896, 897, 690 N.Y.S.2d 369, 370 (4th Dep't 1999)). Both tests are easily met here. It is undisputed that Dr. Swan works as a psychologist, and is an employee and principal shareholder and officer of Swan Consultants, Inc., *see* Pls.' St. ¶ 3, and that "Dr. Swan did act within the scope of his profession and any conduct he is charged with was professionally generated and motivated." Pls.' Mem. for Summ. J. at 7. Nor is it disputed that Dr. Swan interviewed Sola for a position as his assistant, conducted a training session with her, and paid her for it. *See* Pls.' St. ¶ 4. But for Dr. Swan's business, as a part of which he was looking for and training a prospective assistant, any "personal injury" Sola alleges she suffered at the hand of Dr. Swan would not have occurred, and the exclusion accordingly bars coverage.

Finally, and perhaps most importantly, there is a strong public policy argument against imposing on defendants a duty to defend the plaintiffs in this particular underlying action. New York's public policy, while allowing for indemnification for accidental consequences of intentional acts, clearly prohibits indemnification for intentionally caused injuries. *See Public Serv. Mut. Ins. Co. v. Goldfarb,* 53 N.Y.2d 392, 399, 425 N.E.2d 810, 814, 442 N.Y.S.2d 422, 426 (1981). This Court has already determined that the injuries alleged in the Sola Complaint were caused by plaintiffs' intentional acts; such acts

therefore fit squarely within the realm of conduct for which insurance coverage is not to be allowed. As this Court has previously recognized, if doctors "know they will bear the consequences of their sexual improprieties with patients, and cannot pass those costs on to their [ ] insurers, they may be more likely to avoid such incidents." *Dodge,* 102 F.Supp.2d at 157. Denying coverage in cases such as this should then have a strong and valuable deterrent effect. *Id.*

In sum, plaintiffs' alleged actions are not covered by the policies involved. Additionally, public policy considerations prohibit this Court from granting the declaration that plaintiffs seek. Defendants have no duty to defend or indemnify plaintiffs in the underlying action.

## CONCLUSION

For the aforementioned reasons, this Court denies plaintiffs' motion for summary judgment and grants defendants' cross-motion. The Clerk of the Court is hereby directed to close the above-captioned action.

It is **SO ORDERED.**